No. 46,666

IRENE R. BARNES, *et al., Appellants,* v. EMPLOYMENT SECURITY
BOARD OF REVIEW, *et al., Appellees.*

(504 P. 2d 591)

Opinion filed December 9, 1972.

*William O. Eisler,* of Kansas City, Missouri, argued the cause, and *James H. Barnes,* of Kansas City, Kansas, was with him on the brief for appellants.

*Marlin A. White,* of Holton, argued the cause and was on the brief for appellee Employment Security Board of Review.

*Earl J. Engle,* of Kansas City, Missouri, argued the cause, and *Ronald C. Newman,* of Kansas City, Kansas, was with him on the brief for appellee Inter-Collegiate Press, Division of Sargent Welch Scientific Co.

The opinion of the court was deilvered by

FATZER, C. J.: This appeal arises from judicial review of an administrative determination made by the Employment Security Board of Review (board). (K. S. A. 1971 Supp. 44-709 [*i*].) Irene R. Barnes and 65 other appellants (claimants) have challenged the judgment of the district court affirming the findings and conclusions of the board that their unemployment at appellee Inter-Collegiate Press' plant (company) was occasioned by a work stoppage from a labor dispute in which they participated and that they were disqualified from the receipt of unemployment benefits pursuant to K. S. A. 1971 Supp. 44-706 (*d*). Seeking reversal, the claimants contend there was no substantial evidence to support the findings and conclusions of the board.

At the outset, this court's scope of review of employment security cases is limited by K. S. A. 1971 Supp. 44-709 (*i*) which reads in pertinent part:

". . . In any judicial proceeding under this section, the findings of the board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law. . . ."

The pertinent facts of this case disclosed by the record may be summarized as follows: The claimants are employees in the company's bindery, cover and announcement departments, and all are members of the National Brotherhood of Bookbinders Local Union No. 60 (union) which represents them for purposes of collective bargaining. The bargaining agreement between the company and the union expired on August 31, 1970. During July, 1970, the union and the company commenced negotiations on a new contract. Between August 31, 1970, and January 2, 1971, the date of the hearing before the special hearing officer, there had been twenty collective bargaining conferences. At a bargaining conference on October 15,

1970, the union rejected the company's final proposal for a new contract, and the company rejected the union's counter-proposal. On October 16, 1970, the company notified all the claimants they would be locked out until such time as a bargaining agreement was agreed to between the company and the union. The lockout commenced on October 16, 1970, at 3:30 p. m. In response to the lockout, the union immediately commenced picketing the company's plant, which continued to February 2, 1971, the date of the hearing before the board.

Subsequent to October 16, 1970, the company made three proposals to the union to end the lockout. The first proposal was made November 9, 1970. At a bargaining meeting the company proposed that it would immediately end the lockout if the union would give it a no strike commitment through July 1, 1971. The proposal was rejected. The company's second proposal was made on November 23, 1970, in a letter dated November 21, to the effect the company would immediately end the lockout provided the union would agree it would not strike any time between the date of resuming operations and June 30, 1971. That proposal was likewise rejected. The company's third proposal was made in a letter to the union and to the claimants, dated November 24, 1970, that it would immediately end the lockout if the union would give a no strike commitment between February 1, 1971, and June 21, 1971. As part of this proposal the claimants were notified their employment relationship with the company was not terminated; that they could return to their employment at substantially the same wages, hours and working conditions as existed prior to the lockout, and they were instructed to return to work on June 21, 1971, if the lockout had not ended previously by the union's acceptance of the company's outstanding and continuing proposals to end the lockout. The letter also informed the union and the claimants that if the claimants did not return to work pursuant to that agreement, that new employees would be hired commencing November 30, 1970, to temporarily fill the positions vacated by the claimants. The third proposal was likewise rejected.

On February 2, 1971, the date of the hearing before the board, the labor dispute as manifested by the lockout and the strike still existed.

The company is primarily engaged in the printing of yearbooks, diplomas, and graduation announcements, although it does a con-

siderable amount of commercial printing. About 64 percent of the company's yearly volume in yearbooks and announcements is shipped to customers between March and June. In order to meet production requirements for that busy season, the company expands its work force from approximately 235 employees in December to about 560 employees in June. The work force is increased to over 500 by mid-January and reaches a peak by the end of April. In the bindery department the work build-up does not begin until March or April when that department gets ready for the busy season, because the bindery is the final stage of production and that is when items of work begin to come to the bindery. At that point, the company hires temporary people to help in the bindery and there may be as many as 130 people working there at the peak of the season. Even with the increased number of employees, the company works a large number of overtime hours between March and June of each year. Work in the bindery department is the last stage of the manufacturing process in most instances, and the work of the claimants is the heart of the company's manufacturing process. In short, if the company is not able to perform bindery operations on its announcements and yearbooks, it is not in a position to guarantee or to make deliveries to customers on a timely basis.

During the negotiations for a new contract, the company was of the opinion the union intended to engage in a strike of the bindery employees during the busy season in support of its bargaining demands. The union had engaged in such conduct in 1969. The company was also of the opinion it could not economically take a strike by the union during its busy season, and if a strike were to occur, the company would be at the complete mercy of the union. The company knew that the failure to meet delivery schedules would result in the permanent loss of a large number of customers; it would be in no economic position to resist the union, and would be forced to capitulate to the union's demands in order to end the strike.

As indicated, the company offered to end the lockout provided the union would give the company a no strike guarantee through June of 1971. The proposal was made because it would permit the company to guarantee deliveries to customers on a timely basis and would allow the claimants to return to work without completely eliminating their right to strike in support of their bargaining de-

mands. The union rejected the proposal upon the ground the company would not make assurances to the union it would continue to negotiate during the period between November 30, 1970, and June 21, 1971. Despite the union's rejection of the proposal, the company still offered the claimants the right to return to their jobs as a means of ending the lockout and the proposal could have been accepted at any time prior to June 21, 1971.

The claimants, after being locked out and on a date not disclosed by the record, filed claims for unemployment compensation benefits pursuant to K. S. A. 1971 Supp. 44-709 (a) and Volume 2, Kansas Adminstrative Regulations, Employment Security Division Regulation 50-3-2. The record does not contain a copy of any claim setting forth the period for which benefits were claimed, or which alleged the purported date there was a cessation of the stoppage of work. Be that as it may, a special examiner for the Employment Security Division was appointed by the commissioner pursuant to K. S. A. 1971 Supp. 44-709 (b) to make a determination of the claims after such investigation as he deemed necessary. On or about November 20, 1970, following his investigation and hearing, the special examiner denied the claims. Thereupon the claimants perfected an appeal to a special hearing officer of the Employment Security Division pursuant to K. S. A. 1971 Supp. 44-709 (c).

On January 5, 1971, the appeal of the claimants was heard by the special hearing officer and the testimony of three witnesses, James W. Copeland, personnel manager for the company, Meryl A. Cooper, business agent for the union, and Mrs. Dorothy McKay, one of the claimants, was produced. The evidence of those witnesses is summarized and quoted as follows:

Mr. Copeland testified concerning the particulars of the labor dispute and the stage of production at the plant. Concerning the issue of work stoppage, he indicated the company reopened the bindery department on November 30, 1970; that employees hired were all interviewed by him; that all who were placed in the bindery department were advised their employment was on a temporary basis for the duration of the lockout, and that all of the union employees—claimants—were they to return to work that day, would have work to do at their regular jobs.

When asked about the activity in the bindery department from October 16, 1970, until it was reopened on November 30, 1970, Copeland stated, with one exception not here material, there was a

complete work stoppage in the bindery department during that six-week period. He further stated that new work came into the bindery department during the six weeks from the commencement of the lockout until the department was reopened, but because there were no employees to man the machines, the work piled up and was "backlogged."

When asked by counsel for the claimants as to the level of production, Copeland stated:

"Mr. Barnes: Now you did reopen the bindery department, and after you run the ad in the Star about November 29, you reopened and operated the bindery department with these people employed, is that right?

"Mr. Copeland: That is correct.

"Mr. Barnes: And it has been operated since that time by employees that you hired from the outside?

"Mr. Copeland: That is correct.

"Mr. Barnes: Is it in full operation at this time?

"Mr. Copeland: Pretty much so, yes.

"Mr. Barnes: Pretty much so; in other words, you are back in full production at this time?

"Mr. Copeland: Very close to it.

"Mr. Barnes: And how soon after November did you arrive at that full production?

"Mr. Copeland: This I couldn't tell you, I would not be that closely related to the manufacturing process to see whether or not they are up to standard yet. *I question whether they are up to standard now.*

"Mr. Barnes: But you testified they are practically back in full production.

"Mr. Copeland: *I will say that the machinery is manned, yes.*

"Mr. Barnes: All right. *The machinery is manned and your operation is going on normally as far as you know.* Now the previous contract expired August 20, 1970, is that right?

"Mr. Copeland: *No.*" (Emphasis supplied.)

.    .    .    .    .    .    .    .    .    .

"Mr. Barnes: Let we ask, Mr. Copeland, the book-bindery department is now in operation and there are people working there doing the same work these people were doing prior to the time that they left the department, is that right?

"Mr. Copeland: This is correct."

Mr. Cooper testified concerning the labor dispute and the work stoppage. He stated that it was true the claimants could go immediately back to work if they wanted to accept one of the company's proposals to end the lockout.

Mrs. McKay testified she originally thought she had been discharged by the company; however, the company's letter to Mr. Cooper dated December 21, 1970, entered into evidence without

objection by the claimants, clarified the confusion surrounding Mrs. McKay's employment status. The letter indicates:

"So there is no misunderstanding, none of the locked out employees represented by your Union have been discharged by the Company. As you were previously told, all of these employees should report to work on June 21, 1971, if the lockout has not ended before that date."

The record does not contain the special hearing officer's decision disqualifying the claimants from the receipt of benefits. Upon the denial of their claims, the claimants perfected an appeal to the board. It appears the board, upon a review of the record concerning the ineligibility of claimants for benefits as determined by the special examiner and the special hearing officer, determined that the evidence was not conclusive as to the existence or cessation of a work stoppage, and it directed the taking of additional evidence pursuant to K. S. A. 1971 Supp. 44-709 (f) and Volume 2, Kansas Administrative Regulations, Hearing of Appeals, Regulation 48-2-6. The record indicates the only sworn testimony before the board was that of Mr. Cooper. The remainder of the record consists of questions by the executive secretary of the board; questions by the members of the board and its attorney directed to counsel for the parties, seeking factual clarification of the issue of work stoppage, and the responses of counsel thereto. It should be noted that nowhere in the record were there formal objections to the factual responses of counsel.

Lengthy inquiry was made into two aspects of the previous adjudication. First, the board sought information as to whether the claimants could "establish a precise date or approximate date when the substantial stoppage of work ended?" Second, the board sought clarification of the degree of production of the company's plant on or about that date.

With respect to the former aspect, Mr. Eisler, counsel for the claimants, stated, ". . . I *think* that date is on November 30" (Emphasis supplied) when the company began rehiring replacements to operate the bindery. He offered no evidence on behalf of the claimants in support of his supposition. When he was asked by the executive secretary whether the beginning date of hiring would be the date of the ending of the substantial stoppage of work, he responded, "I think this could be determined administratively." Mr. Eisler stated in response to a question by a board member that there was a labor dispute involved and conceded that the claimants

could return to work that day, and if they did, work would be available for them to perform. But, he contended, that if they returned to work they would be forsaking their lawful right to strike which they refused to relinquish, and that the company had chosen to keep them off work because it wanted a no strike agreement from the claimants. It was then that the executive secretary proceeded to make inquiry of Mr. Cooper as follows:

"MR. PHALEN: Mr. Cooper, I notice that you are the business agent for the bindery, *do you have, of your own knowledge,* some of this precise information that they (board) need. It's really only two things. *They need a date when the substantial stoppage of work ended* . . . and [w]e need a date and we need some progression of return to work like about the 20th there was 10 went to work and about the 29th, about 30 more, and by December 15th there was 50. *Can you give that kind of testimony?*

"MR. COOPER: *No, there would be no way I could tell you how many people went in at any time.* I mean they are back in production." (Emphasis supplied.)

. . . . . . . . . . . . .

"MR. PHALEN: Let's, if you can surround that, you are in the nature of an expert witness and if you can help the Board by giving this testimony a little bit more precise even though you didn't ask for a hearing, you could be sworn, *at least we have nothing now and if you added two or three to that, we'd have two or three, if you're willing.*" (Emphasis supplied.)

Whereupon Mr. Cooper was duly sworn.

"MR. CALBERT: Mr. Cooper, could you by chance give us a date when you feel by the activities at this plant that this substantial work stoppage ceased, whether it would be by the number of cars in the parking lot, the number of people that you were able to observe going in the plant, would you have any date that you could give us in this area?

"MR. COOPER: *I don't know what date we could use or how long it would take to put them back, but I mean, they are putting them back on all their equipment, now, all the equipment at the present time is running, from which I've been told by Earl and others out there, and what their production output is I couldn't say, but evidently they are in production in all of it.* They have people on all the equipment at the present time. Normally, you can tell from the outside by their parking lot about what their normal parking facilities are for people in there, and I would say that they are in production now, *I don't know what per cent they would be putting out,* but evidently they have been back to work since November, so they *should* be doing the work. . . ." (Emphasis supplied.)

With respect to the latter aspect, Cooper's testimony sheds light on his lack of knowledge of the facts surrounding the level of production at the plant. Moreover, his subsequent testimony even more graphically reflects the unavailability of evidence concerning the claimants' allegation of cessation of the work stoppage.

"Mr. Phalen: Well, that's all right. The first Sunday in December is the 6th, and the previous Sunday was November 29.

"Mr. Cooper: The 29th—that's when the ad was in.

"Mr. Phalen: Well, we've got one thing established.

"Mr. Cooper: It would be the following Monday that people started applying for work.

"Mr. Phalen: Do you know that the following Monday people started applying for work?

"Mr. Cooper: Yes.

"Mr. Phalen: Do you know if some of them were hired as early as the following Monday?

"Mr. Cooper: Yes.

"Mr. Phalen: Were they hired through that week?

"Mr. Cooper: Well they've been hiring ever since.

"Mr. Phalen: Well, let's just take that one week.

"Mr. Cooper: During that week, yes, because they were coming out through the lines.

"Mr. Phalen: *Through your own knowledge, can you give us the figure of about how many they hired that week?*

"Mr. Cooper: *I don't think I could, no.*

"Mr. Phalen: *Do you have any approximate figures?*

"Mr. Cooper: *I don't really have any idea. I think they started hiring in the cover department first.*

"Mr. Phalen: All right. I was asking about the, actually the week of December 6. Could you say about how many using the observation of the cars in the parking lot or the observation of the people going into the plant and leaving, through the end of December, about how many they have hired?

"Mr. Cooper: Well, possibly within two or three weeks they have what people they wanted to hire.

"Mr. Phalen: Which would be about 66?

"Mr. Cooper: *Well, I couldn't tell you because I don't know what work they had in there at the present time. Well, they backlogged their work so they should have had plenty of work to fill every position.*

"Mr. Phalen: You said they hired about the number of people they wanted to hire.

"Mr. Cooper: Well at that present time. They're not in yearbooks, *what they are doing right now is the backlog—*

"Mr. Phalen: Let's not talk about right now, let's talk about December.

"Mr. Cooper: All right. In December what they were picking up was reprint work which they had backlogged at the lockout.

"Mr. Phalen: All right. About how many people were in the plant in December?

"Mr. Cooper: Undoubtedly around 60 members in the Bookbinders Union.

"Mr. Phalen: All right. Do you think that they had about what they wanted which would be 50 or 60 or 66 in December?

"Mr. Cooper: I imagine by about the third week in December, yes, they did have what they—

"MR. PHALEN: From your own knowledge, could you tell me about when they may have had as much as 30 workers?

"MR. COOPER: Probably about the second week.

"MR. PHALEN: *Could you make it firmer than probably?*

"MR. COOPER: *Well, there is really no way that I could, because I really don't know.*

"MR. PHALEN: From your observation of the cars in the lot?

"MR. COOPER: Yes, I would say by the end of the second week they had well over 30 people in there.

"MR. PHALEN: *You've got more than you had."* (Emphasis supplied.)

Certain other evidentiary matters were brought forth which tended to establish that while the equipment was manned, the work production of the bindery department was not what it normally would have been had the claimants been regularly operating the equipment. In response to a question by Mr. White, the board's attorney, Mr. Engle, counsel for the company, stated that the entire bargaining unit of 66 claimants manning 66 jobs in the bindery department were locked out. When asked by the executive secretary, Mr. Phalen, whether some or substantially all of the 66 jobs had been filled since November 30, Mr. Engle stated:

"MR. ENGLE: I would venture a guess that the company has probably had 100% turn-over in the first replacements.

"MR. PHALEN: How many—give a guess—

"MR. ENGLE: *I do not know how many of these 66 jobs are quote, 'somebody's working in them.' I do know there's been a substantial turn-over in temporary replacements."* (Emphasis supplied.)

In addition, Mr. Cooper testified there is apprenticeship training in the bindery department. He stated the apprenticeship program is *"two years for a girl and four years for a man,* but you are supposed to teach him more than one craft, which you *normally* do . . ."* (Emphasis supplied.) Cooper sought to soften the plain effect of trained and experienced employees processing more work than the untrained temporary replacements by asserting that the company had rehired experienced former employees. When pressed by Engle to supply the names of former employees to support the statement, Cooper could only respond with one name— that of Roy Roush. After being pressed further, Cooper could not say whether Roush was working in the bindery or in fact whether he was working at all; rather, Cooper could only state that Roush was called back by the company. The executive secretary then stated that the relevant factors might be the degree of production and *more important* how many positions were filled in relation to

the norm. Engle disagreed with the secretary's priority with the number of filled positions, drawing the inference that while the company might "have 66 people there manning the equipment" they would *"not be doing the work that five normally do, if they don't know what to do."* (Emphasis supplied.)

Finally, it should be noted there was evidence before the board concerning whether the company had refused work because of the labor dispute and what was the company's expectation of sales for 1971. Mr. Engle stated that while the company had not refused any contracts because of the lockout, "they sure had some business going away," and that after the lockout "they were backlogging work, anything they could get they backlogged." When asked whether there was a substantial downtrend in 1971 as compared to average sales over the last five years because of the lockout, he stated the company was "expecting" the volume of business would exceed last year's volume; that this year's volume *should exceed* last year's volume—"at least that was the pre-plan." Mr. Engle further stated there were people working in the bindery department on a temporary basis "that are learning how to operate the equipment" and when asked whether the company "would be in normal operation" he denied that fact because "he didn't know what the backlog is; he didn't know how much of this work is going out on a timely basis."

As indicated, the labor dispute disqualification for unemployment benefits in Kansas is found in K. S. A. 1971 Supp. 44-706 (*d*). That section reads:

"For any week with respect to which the commissioner finds that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this subsection shall not apply if it is shown to the satisfaction of the commissioner that: (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and (2) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs any of whom are participating in or financing or directly interested in the dispute: *Provided,* That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment, or other premises: *Provided further, That for the purposes of this subsection, failure or refusal to cross a picket line or refusal for any reason during the continuance of such labor dispute to accept his available and customary work at the factory,*

*establishment, or other premises where he is or was last employed shall be considered as participation and interest in the labor dispute."* (Emphasis supplied.)

We are of the opinion that to invoke the disqualifying provisions of subparagraph (*d*), the board must find two basic elements. First, that the claimant's unemployment is attributable to a "labor dispute" in which he participated, and second, it must further find that the unemployment is caused by a "work stoppage" occasioned by that labor dispute.

Passing on the former element, that a "labor dispute" existed in which the claimants participated, counsel for claimants conceded in oral argument that a labor dispute existed at the company's plant from October 16, 1970, and contined as of the date of the hearing before the board on February 2, 1971. The record indicates the members of the union had commenced picketing of the plant, and in response to the lockout were striking the plant as of the date of the hearing before the board.

While this court has not determined whether a "lockout" is a "labor dispute," the great weight of authority in other jurisdictions is that a "lockout" is one form in which a labor dispute may be manifested. (*Basso v. News Syndicate Co., Inc.,* 90 N. J., Super. 150, *216 A. 2d 597; Oluscazak v. Florida Industrial Commission,* 230 So. 2d 31 [Fla.]; *Cameron et al. v. DeBoard; MacInnes et al.,* 230 Ore. 411, *370 P. 2d 709; Henzel et al. v. Cameron et al.,* 228 Ore. 452, 365 P. 2d 498; *Schoenwiesner v. Division of Employment Security,* 44 N. J., Super. 377, 130 A. 2d 648; Anno: 28 A. L. R. 2d 287.) Consistent with that general rule of law, the board has promulgated Kansas Administrative Regulation 50-3-1 (*d*) which explicitly recognizes a lockout as a form of labor dispute. Hence, we hold the element of unemployment attributable to participation in a labor dispute existed under the facts and circumstances of this case.

Before passing on the second element—the existence of a work stoppage—the board argues that the provisions of K. S. A. 1971 Supp. 44-706 (*d*) italicized above, to the effect that if a claimant refuses for *any reason* to accept his available and customary work he shall be deemed involved in a labor dispute, would disqualify the claimants from receiving unemployment benefits. It contends that when the claimants refused to go back to work, their unemployment was voluntary, and they should be denied benefits as a matter of law, regardless of the conclusion reached as to the ex-

istence of a "work stoppage." We do not agree. Reading K. S. A. 1971 Supp. 44-706 (*d*) in its proper context, it is clear the purpose of the last proviso was to expand upon and define "participation in a labor dispute" rather than to erase the element of "work stoppage" as a condition to concluding that a claimant was disqualified for benefits under the statute. We hold that, to justify a determination of disqualification under the statute, the board must find the claimants were participating in a labor dispute, and their unemployment was caused by a work stoppage at the plant occasioned by the labor dispute.

The issue remaining is whether there is evidence to support the board's determination that a substantial stoppage of work existed at the company's plant because the bookbinders had not returned to work. This court has outlined the ground rules for judicial review of evidentiary matters under the Employment Security Law on prior occasions. First, review must be made in the light most favorable to the holdings of the administrative tribunal. (*Clark v. Board of Review Employment Security Division,* 187 Kan. 695, 359 P. 2d 856; *Pickman v. Weltmer,* 191 Kan. 543, 382 P. 2d 298; *Boeing Co. v. Kansas Employment Security Board of Review,* 193 Kan. 287, 392 P. 2d 904; *Zimmerman v. Board of Review of the Employment Security Division,* 208 Kan. 68, 490 P. 2d 359.) Second, in considering eligibility for unemployment compensation where the employment was terminated initially by a labor dispute, we have held the claimant has the burden of proving that his continued unemployment is not the result of the labor dispute but is caused by some condition beyond his control. (*Pickman v. Weltmer,* supra.)

The board's decision in this matter reads in pertinent part:

"The majority of the Board, however, after reviewing all testimony, finds that there is still a substantial stoppage of work due to the fact that the bookbinders have not returned to their employment and that the employer herein is not operating substantially as they did prior to the commencement of the lockout.

". . . The majority of the Board finds that the employer's letter of November 30 informs all employees that they may return to work on June 21, 1971, at which time the lockout will end. *The majority of the Board, therefore, feels that unless circumstances surrounding the facts involved in this dispute are changed between the date of this hearing and June 21, 1971, that claimants herein will be ineligible until that date.* Should, however, the fact situation change, the claimants should bring this to the attention of the special examiner and request another hearing in regard to the matter." (Emphasis supplied.)

It must be emphasized that it is not the function of this court to weigh the evidence presented to the board. The board has expertise in the field of employment security matters and is the finder of the facts. In addition, in deciding whether parts of the record support the findings of the board, we are bound by the board's criteria as to which statements are to have probative effect. In this respect, K. S. A. 1971 Supp. 44-709 (g) authorizes the board to adopt regulations controlling the conduct of hearings and ". . . appeals shall be in accordance with the regulations prescribed by the board for determining the rights of the parties, whether or not such regulations conform to common law or statutory rules of evidence and other technical rules of procedure. . . ." Pursuant thereto, the board promulgated Volume 2, Kansas Administrative Regulation 48-1-4, Conduct of Hearing. That regulation is applicable to the board's review of findings of special examiners pursuant to 2, K. A. R. 48-2-2 (a) and reads in pertinent part:

". . . The referee shall receive any evidence logically tending to prove or disprove a given fact in issue, including hearsay evidence and irrespective of common law rules of evidence. The referee, when *the* evidence is unnecessarily cumulative in effect or where *the* evidence neither proves nor disproves relevant facts in issue, may, on objection of appellant, claimant, or interested party, or on his own motion, exclude or prohibit any such evidence from being received. . . ."

As indicated, the factual responses of counsel for the claimants and counsel for the company were not objected to in the proceedings before the board. Those responses were to inquiries by members of the board or their representatives. Under those facts and circumstances, we are of the opinion those statements are relevant as logically tending to prove or disprove the disputed fact—whether the work stoppage ceased—so that the board may properly have given them weight and credence in making its determination. (2 Am. Jur. 2d, Administrative Law, § 384, p. 190; *Parsons v. Board of Zoning Appeals*, 140 Conn. 290, 99 A. 2d 149.)

The evidence is conflicting concerning the question of a resumption of normal production operations. The bindery department was opened and production to some degree commenced on November 30, 1970. Temporary employees were hired; the number of persons hired, was not definitively shown. Of the 66 positions available, the record shows from thirty to a full complement of temporary employees may have been hired. The turnover of replacements likewise was not definitively shown; however, there

was evidence to establish that, if believed by the board, there was 100 percent turnover of first replacements. The company was experiencing difficulty in securing new contracts but it was not refusing work because of the lockout, and it anticipated (the company's "pre-plan") that the 1971 volume of business might exceed that of 1970. Likewise, business accepted by the company after the lockout was backlogged and as of the date of the hearing before the board the backlog continued to be a factor. The contention that the company's estimate of its volume of business for 1971 would exceed its last year's volume, as contended by the claimants to show it had resumed normal production, could have been justly considered by the board as being merely the company's expectation or forecast of its business possibilities for that year. It did not show conclusively that the company was back to normal production operations and the forecast could have been based upon the fact that no labor dispute would develop during the coming business year.

The claimants also contend the testimony of James Copeland is conclusive to indicate the work stoppage at the company's plant had ceased effective November 30, 1970. We disagree. Copeland's testimony, taken alone, is so qualified that a logical inference could be drawn by the board in support of either the claimants' position or that of the company. There was no dispute that the temporary employees were attempting to perform the tasks in the bindery; however, Merle Cooper, the union representative, admitted that the apprenticeship period to train, for example, a "folder operator" was anywhere from two to four years. The evidence indicated that the machines were manned but there was no indication that the productive capacity of the plant had returned to the norm. Assuming all of the 66 claimants had been replaced with temporary help, there was no evidence that the replacements were doing the same work the claimants could have performed. On the contrary, the record shows that while the company *might* "have 66 people there manning the equipment" they would "not be doing the work that five (claimants) normally do, if they don't know what to do." Common sense dictates that an untrained employee is less valuable than the experienced employee who knows his way around, so to speak. It should be noted that none of the claimants were terminated. Had they wished to return to work, there was work for them; the lockout was stipulated to end as of June 21, 1971, regardless of the disposition of contract negotiations.

More compelling is what was not proven in the hearing before the board. The claimants could not establish a date when the work stoppage ceased; nor could they do more than speculate as to the number of temporary replacements that were hired. Responses to inquires concerning the number of temporary replacements varied from "[n]o, there would be no way I could tell you . . ." to, "[w]ell, I couldn't tell you because I don't know . . ." to, from 30 in the second week to 50, 60, or 66 in December. When inquiry was made into the level of production at the plant, the responses varied from "what their production output is I couldn't say," to, "I don't know what percent they would be putting out."

The district court, upon review of the board's action in this case, concluded that the board's determination should be affirmed:

"It is interesting to note that in the *Pickman v. Weltmer* case, 191 Kan. 543, which was cited by all of the parties, the court said: 'Generally speaking, and with certain exceptions not here material, the benefits of the Employment Security Law are denied only when the unemployment is due to a labor dispute. Where unemployment is originally caused by a labor dispute, before an employee will be entitled to the benefits of the Act, he has the burden of proving that his continued unemployment is not the result of the labor dispute, but is caused from some other condition beyond his control.'

"It was admitted that the plaintiffs were unemployed because of a stoppage of work at the printing plant of Inter-Collegiate Press because of a labor dispute existing between the company and the Bookbinders Union, and their unemployment continued through February 2, 1971, because they were still unemployed because of a labor dispute at that time existing between the company and the union, and *there was no showing that the stoppage of customary or normal work had ceased to exist for reasons beyond the control of the unemployed workers.*" (Emphasis supplied.)

In *Pickman* we considered whether claimants were entitled to unemployment benefits after a labor dispute had ended. We concluded the claimants in that case would remain disqualified under 44-706 (d) for a period immediately following termination of the strike which is reasonably necessary to physically resume normal production operations in the plant. While the facts and circumstances in that case are distinguishable from those of the case at bar, we adhere to the rule announced. In order to be eligible for unemployment benefits, the claimants were required to prove that the company had physically resumed normal production operations in the plant. The board concluded they failed to do so.

We have announced the rule of law limiting the scope of judicial review in Employment Security Law adjudication in *Chadwick v.*

*Employment Security Board of Review,* 192 Kan. 769, 390 P. 2d 1017, wherein it was stated:

"When the Board makes findings pursuant to 44-705, *supra,* the only function of the district court on judicial review is to determine whether or not there is evidence before the Board which supports the Board's findings. Only after it makes a specific finding that there was no evidence to support the findings of the Board could the court set them aside. The law expressly limits the jurisdiction of courts to questions of law. And whether there is evidence to sustain the Board's decision is a question of law.

"While a court sitting as a Board of Review might have reached a different conclusion on conflicting evidence, or in determining a preponderance of the evidence, it is, nevertheless, bound to uphold the finding of the Board if there is relevant evidence before the Board to support its findings." (I. c. 771, 772.)

This court does not intend to engage in protracted discussions of the difference between an affirmative finding of a "substantial stoppage of work" and a negative finding that the claimants failed to sustain the burden of proving that the work stoppage ceased. Suffice it to say technical distinctions may be made between the two. We are of the opinion the district court properly construed the conclusions of the board to indicate that the claimants had failed to prove the work stoppage had ended.

While we are mindful that the benefit provisions of the Employment Security Law are to be construed liberally in favor of the beneficiary, and provisions for disqualification are to be narrowly construed as constituting an exception to the Act, we hold the district court did not err in affirming the board's determination and concluding the findings of the board place the appellants within the scope of the disqualification found in K. S. A. 1971 Supp. 44-706 (*d*). The claimants failed in their burden of showing that a work stoppage at the company's plant had ceased, *i. e.,* that the company had regained production to a point at which its business operations were substantially normal.

The claimants assert that K. S. A. 44-718 (*b*) precludes the assessment of costs against them as appellants in this case. We do not agree. In substance the statute provides that no individual claiming benefits shall be "charged fees of any kind" in any proceeding under the Act by the labor commissioner or his representative or by any court or officer thereof. It is unrealistic to suppose the Legislature intended that, in providing for judicial review of administrative findings of the board by the district courts of this state and by this court, costs and expenses of such a review would be considered as

"fees" which are precluded from assessment by the statute. Generally speaking, fees are compensation for the performance of services, while costs are expenses allowed to a party which are incurred in the maintenance of a lawsuit. The court is of the opinion that 44-718 (*b*) does not preclude the charging of costs and expenses which were incurred in the maintenance of an appeal in the district court and in this court by the appellants as the claimants in this case.

In conclusion, we think it necessary to admonish the board, its representatives, and counsel for all parties that this court is not impressed with the diligence of investigation that has been exhibited by the record in this case. It should have been a routine matter of administrative procedure to subpoena the employment and production records of Inter-Collegiate Press in order to ascertain with factual precision whether the plant was back to normal production operations. Likewise, sworn testimony could have been secured at the hearing before the special hearing officer and the board, which could have demonstrated what elements were necessary to establish the existence or termination of the work stoppage. This record presents a classic example of the graphic need for an administrative procedure Act in this state. Until such an Act is passed, the board should keep in mind the admonition of this court in *Kansas Public Service Co. v. State Corporation Commission,* 199 Kan. 736, 433 P. 2d 572, with respect to the duty of administrative boards and commissions to make adequate findings of fact in determining controversies properly before them. We cannot say that the findings of the board are inadequate in this case, but a study of the record reveals that additional and more detailed findings would have been proper.

The judgment of the district court is affirmed.

PRAGER, J., dissents.