(9 P.3d 575)
No. 83,860

DAVID E. KITCHEN, *et al.*, *Appellants*, v. EMPLOYMENT SECURITY BOARD OF REVIEW, *Respondent*, and GENERAL MOTORS CORPORATION, *Appellee*.

Opinion filed July 21, 2000.

*Mark A. Kistler* and *Bruce C. Jackson, Jr.*, of Yonke, Arnold, Newbold, Winter & Jacoby, P.C., of Kansas City, Missouri, for the appellants.

*Patrick M. Gavin* and *Rosalee M. McNamara,* of Lathrop & Gage, L.C., of Kansas City, Missouri, for the appellee.

Before MARQUARDT, P.J., PIERRON, J., and ROGG, S.J.

PIERRON, J.: David E. Kitchen, appellant, and approximately 3,500 hourly employees of the General Motors (GM) Fairfax plant in Kansas City, appeal the decision of the district court requiring them to refund the Kansas Department of Human Resources an overpayment of unemployment benefits based on a one-time special payment made by GM. Kitchen argues the district court erred in finding the one-time special payment was remuneration in the form of back pay or settlement because the payment was not made under any contractual, statutory, or remedial entitlement, and that the payment is not back pay as a matter of law.

The facts are not disputed. In early June 1998, members of the United Automobile Aerospace and Agricultural Implement Workers of America (UAW) went on strike at two of GM's plants in Flint, Michigan. These two plants produced parts necessary to GM's production nationwide. As a result, production at GM's Fairfax plant in Kansas City, Kansas, ceased. Kitchen was an hourly employee of GM's Fairfax plant. Between June 8, 1998, and August 3, 1998, Kitchen was laid off due to lack of available work. The Flint strikes concluded on July 27, 1998, after GM and the UAW reached an agreement.

The terms and conditions of employment for the Fairfax hourly employees are governed by a national collective bargaining agreement (national agreement) negotiated between GM and the UAW. Pursuant to the national agreement, the week in which Independence Day falls is designated as the Independence Week shutdown period. If an employee meets the specific criteria set forth in the national agreement, the employee will receive 32 hours of Independence Week shutdown pay and 8 hours of holiday pay for that week. As a general rule, no production is performed that week.

As part of resolution of the Flint strikes, on July 28, 1998, GM and the UAW entered into a "MEMORANDUM OF UNDER-

STANDING ONE TIME SPECIAL PAYMENT," which provided:

"As a result of these negotiations and without prejudice to the position taken by either party, and without setting any precedent in the disposition of any other case involving similar circumstances, the parties agree to the following:

"Employees who were on strike or layoff status at General Motors locations due to the labor dispute at the Flint Metal Center and Delphi E Flint East and who did not receive Independence Week Shutdown and Holiday Pay as a result of being on said layoff or strike and were otherwise entitled to these pay provisions as stipulated in the GM-UAW National Agreement, shall receive a one time special payment in the amount they would have been entitled to had they not been on strike or layoff.

"This payment will be made in an expeditious manner and taxed as a regular wage payment in accordance with Document No. 81 of the GM-UAW National Agreement.

"This payment shall initially be made by General Motors. Thereafter, payments otherwise required by Paragraph III.A of the Memorandum of Understanding Joint Activities, 1996 GM-UAW National Agreement, shall be waived until General Motors is reimbursed for the total amount paid to employees as a result of this Memorandum.

"Further, the parties recognize that these payments may result in employees being ineligible for unemployment compensation already received. Employees impacted by such overpayment of unemployment compensation will be responsible to repay the State that provided the unemployment compensation."

As a result of the Memorandum of Understanding, Kitchen received a check dated August 9, 1998, for a total of 40 hours of pay at his regular rate. The check stub designated 32 hours as a miscellaneous payment and 8 hours as a miscellaneous payment. At the request of the UAW, union dues were withheld from the payment. Kitchen received vacation and wage progression credit as a result of the payment.

During Kitchen's layoff period, he applied for and received unemployment compensation from the Kansas Department of Human Resources (KDHR). As a result of the one-time special payment, the KDHR found Kitchen was disqualified for unemployment benefits for the week of June 28, 1998, through July 4, 1998, covering the shutdown period. The KDHR found the one-time special payment was a back pay award or settlement and

Kitchen was required to refund the KDHR the $281 he received in unemployment benefits for that week.

Kitchen appealed the notice of determination to a KDHR Referee. The Referee found the one-time special payment was a wage payment pursuant to Kansas Employment Security statutes. The Referee then concluded the wage payment was attributable to the period from June 8, 1998, to July 4, 1998. Kitchen appealed the Referee's decision to the Kansas Employment Security Board of Review (Board). The Board affirmed the Referee's decision that the one-time special payment was back pay. There was a dissent.

Kitchen appealed the Board's decision in district court. The court found there was insufficient evidence to support a finding that the one-time special payment was something other than wages paid to Kitchen as compensation for services. The court found Kitchen received the payment because he was an employee of GM, that any other reason for the payment was immaterial, and that the source of the funds for the payment was agreed upon by GM and the UAW. The court concluded the payment did not fall within any of the statutory exceptions to the definition of wages. The court affirmed the previous decisions which held Kitchen received an overpayment of benefits for the applicable week. Kitchen appeals.

In this case we are called upon to construe several provisions of the Kansas Employment Security Law, K.S.A. 44-701 *et seq.*, following review by the Board. The burden of proving the invalidity of the Board's order is on Kitchen. K.S.A. 77-621(a)(1).

Interpretation of a statute is a question of law, and our review is unlimited. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997). Usually, interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to great judicial deference. Deference to an agency's interpretation is particularly appropriate when the agency is one of special competence and expertise. The agency's interpretation of a challenged statute may be entitled to controlling significance in judicial proceedings. Further, if there is a rational basis for the agency's interpretation, it should be upheld on judicial review. *Kansas Univ. Police Officers Ass'n v. Public Employee Relations Bd.*, 16 Kan. App. 2d 438, 440, 828 P.2d 369 (1991).

Although an appellate court gives deference to the agency's interpretation of a statute, the final construction of a statute lies with the appellate court, and the agency's interpretation, while persuasive, is not binding on the court. The courts are the final arbiters in interpreting statutes and will take corrective action if an administrative body's interpretation is erroneous as a matter of law. *In re Tax Appeal of Univ. of Kan. School of Medicine*, 266 Kan. 737, 749, 973 P.2d 176 (1999).

Persons claiming unemployment benefits are entitled to a liberal interpretation of the employment security statutes and the right to receive such benefits is determined by the provisions of the statutes. *Southwestern Bell Telephone Co. v. Employment Security Board of Review*, 189 Kan. 600, 604, 371 P.2d 134 (1962); *Farmers Co-op Elevator v. Kansas Employment Security Bd. of Review*, 25 Kan. App. 2d 567, 572, 966 P.2d 699, *rev. denied* 266 Kan. 1108 (1998).

The Kansas Employment Security Law is designed to prevent the spread of involuntary unemployment and to "lighten its burden which now so often falls with crushing force upon the unemployed worker and his [or her] family." K.S.A. 44-702. Generally, an individual shall be deemed unemployed and entitled to unemployment benefits "with respect to any week during which such individual performs no services and with respect to which no wages are payable to such individual." K.S.A. 1999 Supp. 44-703(m).

The term "wages" is defined in K.S.A. 1999 Supp. 44-703(o) in general, all encompassing terms as

"all compensation for services, including commissions, bonuses, back pay and the cash value of all remuneration, including benefits, paid in any medium other than cash. The reasonable cash value of remuneration in any medium other than cash, shall be estimated and determined in accordance with rules and regulations prescribed by the secretary."

The object of Kitchen's arguments on appeal is for the most part limited to proving the one-time special payment is not "back pay" as a matter of law. However, it is not readily apparent what classification of compensation Kitchen would give the one-time special payment. Kitchen attempts to argue this is strictly a "back pay" issue and there were no other findings concerning wages. To the

contrary, the Referee's decision, which was essentially approved by the Board, stated: "In this particular case there is no doubt that the payment made in August 1998, received by the claimant, was a wage payment. The statutory scheme above would clearly define it as a wage payment and the parties both treated it as a wage payment."

The provisions for the Independence Week shutdown period are provided in the "Vacation Entitlement" section of the GM/UAW National Agreement. In order to qualify for shutdown pay, the employee must have seniority as of the date of each shutdown day (worked during at least 13 pay periods during the eligibility year), be on the active rolls and would otherwise have been scheduled to work, and worked their last scheduled work day in the period prior to and next scheduled work day in the pay period after the shutdown.

Kitchen cites provisions of the national agreement explaining the shutdown pay and testimony of Cheryl Ollila (GM's Assistant Director of Labor Relations) at the Referee hearing in arguing that he and his fellow employees were not entitled to the shutdown pay. Kitchen argues since he cannot claim any contractual entitlement to the shutdown pay for 1998, and since there were no claims GM engaged in any conduct violative of any statutory employment authority, there can be no claim the one-time special payment constituted back pay as that term is known by its acquired peculiar and appropriate meaning in law. Consequently, he argues the Board and district court erred in interpreting K.S.A. 1999 Supp. 44-706(s).

GM responds that the concept of "entitlement" does not appear anywhere in K.S.A. 1999 Supp. 44-706(s). GM argues individuals are disqualified from unemployment benefits where they receive remuneration in the form of a settlement. GM contends settlements by their very nature often involve disputes as to "entitlements" and payments made pursuant to settlements are not necessarily made because the employer actually owed the employee something to which the employee was entitled. GM argues definition limitations on back pay do not account for a disqualification

of benefits based on a settlement under K.S.A. 1999 Supp. 44-706(s).

Kitchen argues the term "back pay" constitutes a phrase that has acquired a peculiar and appropriate meaning in law which does not apply to this case. Black's Law Dictionary 133 (7th ed. 1999), defines "backpay award" as "[a] judicial or quasi-judicial body's decision that an employee or ex-employee is entitled to accrued but uncollected wages or benefits.—Sometimes shortened to *backpay*." Kitchen cites *Social Security Board v. Neirotko*, 327 U.S. 358, 364, 90 L. Ed. 2d 718, 66 S. Ct. 637 (1946), where the Supreme Court explained that "back pay" is a form of remuneration that is reparation "based upon the loss of wages which the employee has suffered from the employer's wrong." Kitchen also cites several regulatory provisions providing back pay awards for unlawful employment practices and/or unlawful discriminatory practices. See K.S.A. 1999 Supp. 44-1005(k) (Kansas Act Against Discrimination); 5 U.S.C. § 1221(g)(1)(A)(ii) (1994) (Whistleblower Protection Act); 29 U.S.C. § 160(c) (1994) (National Labor Relations Act); 29 U.S.C. § 660(c)(2) (1994) (Occupational Safety and Health Act); 29 U.S.C. § 2104 (a)(1)(A) (1994) (Worker Adjustment and Retraining Notification Act); and 42 U.S.C. § 12117 (1994) (Americans with Disabilities Act).

Kitchen also contends the one-time special payment is not back pay because GM received valuable consideration for the payment. First, he argues the Memorandum of Understanding was the catalyst for settling the strike and, therefore, prohibits a finding that the one-time special payment was a settlement constituting back pay. Kitchen cites *Green Ridge Min. v. Unemp. Ins. Bd.*, 541 N.E.2d 550 (Ind. App. 1989), where the court held that a $15,000 payment from an employer to an employee to settle a suit for alleged unlawful discharge did not disqualify the claimant from unemployment benefits; *Schneider v. Hutt*, 87 Wash. 2d 961, 558 P.2d 170 (1976), where payments for violating a collective bargaining agreement did not disqualify employees from unemployment benefits; and *State, Dept. of Indus. Relations v. Deslattes*, 372 So. 2d 867 (Ala. Civ. App. 1979), where voluntary payments to em-

ployees upon termination was not wage remuneration because the employer was not legally obligated to make payments.

GM argues Kitchen raises the consideration argument for the first time on appeal and we are precluded from addressing it. See *Furthmyer v. Kansas Dept. of Revenue*, 256 Kan. 825, 827-28, 888 P.2d 832 (1995) (issues and legal theories not raised below cannot be raised for the first time on appeal). Addressing the argument, GM argues there is no evidence in the record that the payment was made with the intent to settle the strike. We do not find that argument persuasive.

GM convincingly distinguishes *Green Ridge Mining* since the court held Green Ridge paid employee Kraus to dismiss his discrimination suit, not to compensate him for lost income or benefits due to unemployment, and the payment was not tied to the weeks of unemployment. 541 N.E.2d at 553. Further, in *Schneider*, the employees, some of whom would not have been entitled to back pay at all, received a pro rata share of the arbitrator's award unrelated to the employee's actual missed wages. The award in *Schnieder* was for violating the bargaining agreement and the damages were more like an award for tortious conduct rather than back pay for lost wages. 87 Wash. 2d at 965-66. Additionally, in *Deslattes*, the termination payment clearly fell within the Alabama statute providing that dismissal payments which an employee is not legally obligated to make are not considered wages. 372 So. 2d at 869.

GM's argument here is persuasive.

The second form of consideration cited by Kitchen is the temporary release of GM's contributions to the Nickel Fund. He states that in the past, GM received no break from its Nickel Fund obligation for the Independence Week shutdown pay. Consequently, he maintains to classify the one-time special payment as back pay would create a windfall to GM through resolution of the strike, reimbursing GM by temporarily suspending payments to the Nickel Fund, and allowing GM to receive credit for the amount of overpayment repaid to the KDHR.

GM states there is no question it paid the one-time special payment with GM money, but it is irrelevant that it was allowed to offset the payment out of contributions to the Nickel Fund. The

payment was still wages. GM points out that the UAW agreed to payment of the money out of the Nickel Fund. GM cites the district court's comments:

"[T]he joint act of diverting money destined for this fund to reimburse GM for a payment made by it to employees of the company so the employees will not lose pre-designated compensation and benefits for a period of time they would have been off the job anyway because of the strike is, nevertheless, still compensation paid by GM solely because these individuals were, in fact, employees of General Motors."

We again find GM's argument persuasive.

Kitchen also argues that the one-time special payment did not constitute wages because he performed no services during the week in question or in return for the one-time special payment. K.S.A. 1999 Supp. 44-703(o) defines wages, in part, as "all compensation for services." Kitchen states it is undisputed that he performed no services during the week of June 28 through July 4, 1998. Kitchen again argues the one-time special payment was made simply as part of the agreement to settle the Flint, Michigan, strikes.

The one Kansas case that has addressed issues relatively close to those raised in the case at bar is *Erickson v. General Motors Corporation*, 177 Kan. 90, 276 P.2d 376 (1954). In *Erickson*, the petitioners were UAW represented employees of GM working at the Fairfax plant. The employees were laid off during the week of December 24 through December 29, 1951, due to government material restrictions. The employees returned to work on January 2, 1952. GM paid the employees "holiday pay" for Christmas Day, December 25, 1951. However, the employees filed claims for unemployment benefits for the full week of December 24 through December 29, 1951.

The issue addressed in *Erickson* was whether the holiday pay received for Christmas Day 1951 was "wages" as defined in K.S.A. 44-703(o), which contained practically the same language in 1951 as contained in K.S.A. 1999 Supp. 44-703(o) today, and whether those benefits were deductible from unemployment benefits received by the employees.

In order for the *Erickson* employees to be entitled to the "holiday pay," they had to meet certain requirements. Under the national agreement, the employees were only eligible for "holiday pay" if they had seniority of 90 days, they would have otherwise been scheduled to work if the day was not observed as a holiday, and the employees worked the last scheduled work day prior to and the next scheduled work day after the holiday within the scheduled work week.

The *Erickson* employees raised several of the same arguments set forth by Kitchen. In *Erickson*, the employees argued the national agreement did not classify holiday pay as wages, that the general definition of "wages" in K.S.A. 44-703(o) did not include holiday pay, that the UAW and GM agreed that holiday pay was not wages, and that no services were rendered on Christmas Day.

The *Erickson* court held the holiday pay received by the petitioners for Christmas Day 1951 was wages within the *statutory* definition and paid with respect to the week beginning December 24, and was deductible from unemployment benefits due to the petitioners for that week. The court supported its conclusion with several rulings relevant to our case. First, the court held that under the national agreement, the petitioners were entitled to receive holiday pay and they did receive it. Second, the question of whether the holiday pay constituted wages was a statutory question and not resolved by agreement between the UAW and GM. Third, holiday pay fell within the definition of wages by not being mentioned in the list of payments in K.S.A. 44-703(o) that did not constitute wages. The court stated:

"[Holiday pay] was a condition of his employment, and he had to work to get it, and he got it as part of his compensation. If that be not true, then the employee received something to which he was not strictly entitled, a thing ordinarily called a bonus, and if it was a bonus, it was still wages under the statutory definition of wages." 177 Kan. at 98-99.

Fourth, the court found Erickson received the holiday pay in the check when he should have received the holiday pay. Last, the court acknowledged the persuasive authority cited by Erickson as to decisions from other jurisdictions under similar facts and statutes

but held them not controlling as the question was to be determined under Kansas statutes. 177 Kan. at 99.

Kitchen's attempt at distinguishing *Erickson* is not persuasive. With one exception, that being that the payment was made at the normal pay period, *Erickson* presents virtually the same situation as this case. Kitchen cites to the *Erickson* court's statement that Erickson was entitled to receive holiday pay and he did receive it. We believe the court's statement is properly rephrased to say that Erickson was *contractually entitled* to receive the holiday pay pursuant to the national agreement. The *Erickson* court appears to gloss over the fact that Erickson was *not eligible* to receive the holiday pay because, by virtue of being laid off during the week of the holiday, he did not work his last scheduled work day prior to and after the holiday. Possible explanations for this are that Erickson was eligible for the holiday pay because he worked his last scheduled work day prior to and after the layoff period which encompassed a holiday, or that Erickson was entitled to the holiday pay simply because he was a GM employee.

Kitchen cites several decisions from employment boards in other jurisdictions where the one-time special payment was not considered back pay or wages. In response, GM cites employment board decisions where the one-time special payment was considered wages. As with unpublished decisions of our court, these employment board decisions have no precedential value. See *In re Appeal of K-Mart Corp.*, 238 Kan. 393, 396, 710 P.2d 1304 (1985)(the doctrine of stare decisis is inapplicable to decisions of administrative tribunals); *Hile v. DeVries*, 17 Kan. App. 2d 373, 375, 836 P.2d 1219 (1992) (unpublished appellate opinions are not binding precedent).

Absent the employment board decisions, neither party cites any published authority concerning the one-time special payment. Our research has revealed only one case, decided less than a month prior to oral argument, addressing the same one-time special payment, *Aaron v. Review Bd. of Workforce Devel.*, 726 N.E.2d 880 (Ind. App. 2000). In *Aaron*, the employment board found the one-time special payment was deductible from unemployment benefits in the week when the payments would have been paid if not for

the layoffs. However, the *Aaron* court reversed the board and held the one-time special payments, under Indiana law, were deductible from the employees' unemployment benefits when they were actually paid.

The Indiana employment security statutes, Ind. Code § 22-4-5-2 (1991), specify when to attribute some categories of income deductible from unemployment compensation benefits. Payments for vacation pay "made subsequent to the normal pay day for the pay period in which the vacation was taken" are deductible from unemployment compensation benefits during the week "in which" the payments are actually paid. Ind. Code § 22-4-5-2(c). The *Aaron* court held there was no evidence in the record that the one-time special payment was anything but " '[p]ayment of vacation pay made subsequent to the normal pay day for the pay period in which the vacation was taken [and] shall be deemed deductible income with respect to the week in which such payment is made.' " 726 N.E.2d at 887 (quoting Ind. Code § 22-4-5-2[c]). Consequently, the one-time special payment was attributable to the week in August when the GM employees were back at work, and not attributable to Independence Week when the employees were laid off and receiving unemployment benefits that could be reduced.

The *Aaron* court also addressed the language in the Memorandum of Understanding concerning the possibility that the one-time special payment "may result" in ineligibility for unemployment benefits already received and that the employees would be responsible for repayment if that occurred. 726 N.E. 2d at 887. The court had no argument with the claim that the one-time special payment was deductible income as provided in the Indiana employment security laws, but held the last paragraph of the Memorandum of Understanding did not reveal any agreement by the parties as to when the deductible income should be deducted from the benefits. 726 N.E.2d at 887-88.

Absent the Memorandum of Understanding, Kitchen would not have received the shutdown and holiday pay. He was not eligible under the national agreement because as he was not on the active roll due to the layoff. On the other hand, as found by the court in *Aaron*, "[t]hose employees of the employer who worked during the

strike period, and were eligible for the Independence Week shut-down pay and Independence Day holiday pay, received these pay-ments, and did not receive the above special payment." 726 N.E.2d at 883. A month after the time when he would normally have re-ceived the shutdown and holiday pay, Kitchen received the pay.

It is clear from the language of the Memorandum of Under-standing that GM and the UAW intended the one-time special payment to be wages or remuneration or compensation for the shutdown payment. We agree with Kitchen that the Memorandum of Understanding does not expressly state either that the one-time special payment was intended to be wages or that it contains a specific date as to which the payment would apply, and that the parties could easily have done so. We also agree with Kitchen that the parties cannot dictate how the payment will be treated under the employment security statutes. See *Erickson*, 177 Kan. 90 (par-ties agreed the holiday pay would not be considered wages, but court disagreed under the provisions of the employment security law). However, there is a clear intent for the one-time special pay-ment to constitute compensation for the shutdown.

The parties' intent to treat the one-time special payment as wages is evident in several ways. First, the express language of the Memorandum of Understanding provides that the one-time special payment was for employees who were on strike or layoff and who did not receive shutdown pay. Second, the one-time special pay-ment was equal to the amount the employees would have received in week pay had they not been on strike or layoff. Third, GM and the UAW characterized the payment as being taxed as a "regular wage payment." Fourth, the memorandum contemplates the pos-sibility that unemployment benefits "already received" by the em-ployee would be jeopardized. Fifth, both GM and the UAW treated the one-time special payment as wages through wage progression and vacation credit, and assessment of union dues. Sixth, the one-time special payment was not listed as a specific amount of money, but was geared toward what the employee would be entitled to for Independence Week shutdown pay. Last, the check stubs desig-nated the payment of 32 hours of miscellaneous and 8 hours of miscellaneous. This was a similar breakdown to the shutdown and

holiday pay in previous years, although it did not specifically list shutdown and holiday pay on the stub. However, in prior years, when holiday pay was not paid in the week of the holiday, it was designated as "miscellaneous" on the paychecks.

Pursuant to the national agreement and *Aaron*, we find the one-time special payment was vacation pay. As vacation pay, the one-time special payment constituted wages under the employment security law. In the context of determining weekly unemployment compensation benefits, K.S.A. 1999 Supp. 44-704(e)(1) provides: "[R]emuneration received under the following circumstances shall be construed as wages: (A) Vacation pay that was attributable to a week that the individual claimed benefits while work was temporarily interrupted." The one-time special payment certainly falls within this definition of vacation pay. Kitchen received contractually entitled vacation pay attributable to the Independence Week shutdown period while work at the GM Fairfax plant was temporarily interrupted due to a layoff.

"It has been generally recognized that vacation pay is a type of wage." *Mid America Aerospace, Inc. v. Department of Human Resources*, 10 Kan. App. 2d 144, 146, 694 P.2d 1321, *rev. denied* 237 Kan. 887 (1985). In determining whether an employer was liable for a statutory penalty for unpaid wages in *Benjamin v. Manpower, Inc., of Wichita*, 3 Kan. App. 2d 657, 659-61, 600 P.2d 148 (1979), the court acknowledged first that vacation pay was "wages" under K.S.A. 44-313(c) and then found, after analysis of the terms of the employment contract, Benjamin's vacation pay was "earned wages" under K.S.A. 44-315(a). See *Sweet v. Stormont Vail Regional Medical Center*, 231 Kan. 604, 612, 647 P.2d 1274 (1982).

Even if the one-time special payment is not considered vacation pay, it could be considered a bonus under the language of *Erickson*. The *Erickson* court's comment concerning the possibility that the holiday pay may have been a bonus is particularly relevant. Arguably, the *Erickson* court added the "bonus" language to demonstrate the holiday pay was wages no matter how one looked at the issue. The shutdown and holiday pay was a condition of Kitchen's employment, and he had to work to get it. He got it as part of his

compensation. If it was a bonus, it was still wages under the statutory definition of wages.

Further, we are not persuaded by Kitchen's argument that if GM truly intended the one-time special payment to affect the amount of overpayment of unemployment benefits, GM could have withheld the amount of overpayment and given it to the KDHR under K.S.A. 1999 Supp. 44-706(s)(2). The provisions of K.S.A. 1999 Supp. 44-706(s)(2) are permissive in nature and do not mandate that the employer withhold any potential overpayment.

The Board and the district court did not err in finding the one-time special payment constituted wages.

The question of whether the one-time special payment was attributable to the week when Kitchen already received unemployment compensation benefits was a question of fact for the Board's resolution.

The scope of our review is defined by K.S.A. 77-621(c). Under the doctrine of operative construction, we may give great weight and judicial deference to the Board's interpretation. See *In re Application of Zivanovic*, 261 Kan. 191, 193, 929 P.2d 1377 (1996). Our review of evidentiary matters before the Board is made in the light most favorable to the Board. *Barnes v. Employment Security Board of Review*, 210 Kan. 664, Syl. ¶ 4, 504 P.2d 591 (1972). *Barnes* teaches:

"The findings of the Employment Security Board of Review as to the facts, if supported by evidence and in the absence of fraud, are conclusive and may not be set aside by the district court."

"While a court sitting as a Board of Review might have reached a different conclusion on conflicting evidence, or in determining a preponderance of the evidence, it is, nevertheless, bound to uphold the findings of the board if there is relevant evidence before the board to support its findings." 210 Kan. 664, Syl. ¶¶ 5, 6.

As discussed above, the court in *Aaron* found the one-time special payment was deductible income attributable to the week it was paid in August. Indiana, however, has a statutory scheme for determining when the deductible income is to be allocated. Kansas does not have a similar scheme. Kansas has multiple provisions to

deal with awards for back pay or settlement. Back pay awards are authorized in situations where employers improperly withhold wages or are guilty of inappropriate employment practices such as discrimination or harassment. However, as the district court noted:

"Even if 'services' were not performed, but a third party finds, or the parties themselves agree (by collective bargaining), that services should have been performed, but were prevented by the employer (or existing circumstances), such 'back pay' or 'settlement' recompense and remuneration is still considered 'wages' and thus disqualifying when the Secretary determines it was recompense for a period during which unemployment benefits were paid (K.S.A. 44-703[o])."

In the statute defining "wages," K.S.A. 1999 Supp. 44-703(o), the Kansas Legislature has provided guidance in applying back pay awards and settlements. After defining wages, K.S.A. 1999 Supp. 44-703(o) provides:

"Notwithstanding the other provisions of this subsection (o), wages paid in back pay awards or settlements shall be allocated to the week or weeks and reported in the manner specified in the award or agreement, or in the absence of such specificity in the award or agreement, such wages shall be allocated to the week or weeks in which such wages, in the judgment of the secretary, would have been paid."

The employment security statutes also contain a laundry list of situations where individuals are disqualified from receiving unemployment benefits. Similar to the allocation in the above definition of wages, one such disqualification is the receipt of a back pay award or settlement in K.S.A. 1999 Supp. 44-706(s), which prohibits unemployment benefits

"[f]or any week with respect to which an individual is receiving or has received remuneration in the form of back pay award or settlement. The remuneration shall be allocated to the week or weeks in the manner as specified in the award or agreement, or in the absence of such specificity in the award or agreement, such remuneration shall be allocated to the week or weeks in which such remuneration, in the judgment of the secretary, would have been paid."

In *Aaron*, the one-time special payment was attributable to the week in August when it was paid because the date of the payment controlled the allocation. Ind. Code § 22-4-5-2(c) (1991). In K.S.A. 1999 Supp. 44-703(o) and K.S.A. 1999 Supp. 44-706(s), the date of the payment is not controlling; rather, the payment is allocated

to the week or weeks "in the manner as specified in the award or agreement" or absent specificity, to the judgment of the Secretary. In *Southwestern Bell Telephone Co. v. Employment Security Board of Review*, 189 Kan. 600, 605, 371 P.2d 134 (1962), the court stated: "Generally speaking, wages are tied to the week of work and not to the week in which they are paid. In order to associate pay with specific weeks, there must be some connection between the two."

The language of the Memorandum of Understanding and the references to the national agreement clearly provided the one-time special payment was for wages allocated to the shutdown and holiday pay that the employees did not receive because of the strike and/or layoff. The Board was not persuaded by Kitchen's argument that specific references to the shutdown and holiday pay were merely to establish the amount of the payment. Neither are we.

Notwithstanding the statutory provisions concerning wages or remuneration paid in back pay awards or settlements, on a more elementary level, an individual cannot be considered unemployed and entitled to benefits if he or she receives wages for the time period in question. K.S.A. 1999 Supp. 44-703(m) provides that an individual shall be deemed unemployed and entitled to unemployment benefits "with respect to any week during which such individual performs no services and with respect to which no wages are payable to such individual." Kitchen clearly performed no services during the shutdown period, but he received wages with respect to the Independence Week shutdown period. He was not entitled to unemployment benefits for that week.

We find there is substantial competent evidence to support the decision of the Board and the district court that the one-time special payment was a wage payment allocated to the week of June 28 -July 4, 1998, and Kitchen received an overpayment of unemployment benefits for that time period.

Affirmed.