(966 P.2d 699)

No. 77,764

FARMERS COOPERATIVE ELEVATOR and MERCANTILE ASSOCIATION, *Petitioner/Appellee*, v. KANSAS EMPLOYMENT SECURITY BOARD OF REVIEW, *Respondent/Appellant*, and LARRY REBARCHEK, *Respondent/Appellee*.

Opinion filed October 16, 1998.

*James R. McEntire*, of Kansas Department of Human Resources, for appellant.

*Ward Loyd*, of Ward Loyd Law Offices, L.L.C., of Garden City, for appellee Farmers Cooperative Elevator and Mercantile Association.

*Lawrence M. Gurney*, of Wilson, Lee & Gurney, of Wichita, for appellee Rebarchek.

Before GERNON, P.J., PADDOCK, S.J., and CHARLES E. WORDEN, District Judge, assigned.

PADDOCK, J: This is an unemployment benefits case pursuant to the Kansas employment security law, K.S.A. 44-701 *et seq.* The Kansas Employment Security Board of Review (Board) appeals the district court's decision denying unemployment benefits to Larry Rebarchek, the former employee of Farmers Cooperative Elevator and Mercantile Association (Farmers). The Board also appeals the decision of the district court that the Board violated K.S.A. 1997 Supp. 44-714(f) by refusing to allow Farmers to receive the transcript of the benefit hearing held before the referee.

*Facts*

Larry Rebarchek began employment with Farmers in 1979 and became the branch manager of Farmers Elevator at Shields, Kansas, in 1986. The Shields elevator is one of five elevators owned by Farmers and consists of six silos for storing wheat, corn, and milo.

As branch manager, Rebarchek was responsible for receiving and loading the grain when purchased and sold, for the maintenance and cleaning of the facility, and for seeing that the grain was turned or moved as necessary to prevent overheating. The overheating of the grain is announced by the development of "hot spots" that are measured by gauges attached to each grain bin. If hot spots develop and the grain is not moved or turned, the grain can overheat rapidly, resulting in a lower quality and a corresponding reduction in value.

Robert Mudd was the other employee at the Shields facility. He had been employed at Farmers' elevators for over 12 years and had worked at the Shields elevator under Rebarchek's supervision during Rebarchek's term as branch manager.

Mudd was considered by both Farmers and Rebarchek to be a dependable employee who could be trusted to perform his job assignments in a proper manner. He fully understood the danger that the development of hot spots held for grain quality. He knew how to read the temperature gauges, knew that the readings were to be recorded, and knew the necessity and the procedure for turning or moving the grain to prevent overheating.

Beginning in January 1994 and extending into 1995, Rebarchek suffered from a back injury which prevented him from performing many of the tasks at the elevator. He was on sick leave for long periods.

During 1994, Rebarchek gave Mudd responsibility for checking for hot spots on a regular basis every week. Rebarchek consulted Mudd as to hot spot activity, and Mudd reported that everything looked fine.

The delegation of authority by a supervisor to an employee occurred within Farmers' organization. Rebarchek's immediate supervisor would delegate company work to other employees and expected those performing the work to follow his directions. Farmers' general manager testified at the hearing before the referee that Rebarchek, during his injury-related absences, had the right to rely on Mudd to handle day-to-day operations at the Shields elevator.

Rebarchek was on sick leave during the time in July 1994 when the grain was scheduled for moving or turning. When he returned to work in July, he noted that Mudd had recorded that the grain had been turned. Rebarchek had no reason to doubt the records and, as far as he knew, the wheat had been turned as reported.

Rebarchek was again absent from work because of his back problem in September 1994, at the time the wheat had been scheduled for turning. Upon his return to work at the end of September or early October, he was informed that the wheat that Mudd had loaded for sale had been graded poor in quality. Rebarchek did everything he could to discover the source of the bad grain, including personally turning the grain and seeing that samples were tested. The tested samples indicated a grade 2 grain, which is the quality that Farmers aims to maintain. Rebarchek reported these results to his supervisor, who was assured that the grain quality was not as bad as had been feared. Thus, at this point, Rebarchek had no reason to doubt that Mudd had completed the turning as recorded.

In November 1994, Rebarchek again injured his back and was absent from work. Grain quality deteriorated in January, and in February 1995, Rebarchek discovered that corn bins that Mudd

had told him had been emptied still contained caked corn. Rebarchek also found that Mudd had recorded temperatures in the log without reading the gauges. At this point, Rebarchek first suspected that Mudd was not performing his job. Rebarchek reported to Farmers the problem with the corn and his suspicion concerning poor work performance by Mudd.

Upon discovering the corn was hot, Rebarchek worked overtime to personally turn and cool it. He volunteered to work through the weekend to finish the turning; however, his supervisor told him the bins could wait because he wanted Rebarchek to attend the annual company meeting that weekend. Rebarchek's supervisor expressed no criticism of his management of the elevator at that time.

The Shields elevator was inspected in February and some cleanliness problems had been noted. Rebarchek addressed these problems. A follow-up inspection was made on March 15, 1995, and the facility received average and above average ratings on 10 out of 12 inspection areas. The only below average ratings were due to dust on the floor and on the dryer screens.

The November 1994 back injury had occurred on the job, and Rebarchek had filed a workers compensation claim. On March 21, 1995, Rebarchek received a written reprimand, citing a lack of management as to grain quality, maintenance, and cleanliness of the facility.

Rebarchek was scheduled for back surgery on March 24, 1995. He spent the next 2 days after his reprimand checking grain temperature, seeing to various maintenance and cleaning tasks, and writing detailed instructions for what Mudd needed to do during his absence.

During Rebarchek's absence, the facility was again inspected and graded deficient because of mud on the floor and dust and dirt behind the file cabinets.

Rebarchek returned to work on April 17, 1995. On April 24, 1995, he was discharged. The reasons given him for his discharge were the grain quality problems which resulted in losses to Farmers and the lack of cleanliness of the facility. Rebarchek's supervisor testified that he had decided to discharge Rebarchek after unfavorable corn grades started showing up in April.

Following his discharge, Rebarchek filed for unemployment benefits. Farmers contested his claim. The examiner initially in charge of considering the claim found that Rebarchek had been discharged for misconduct as defined by K.S.A. 44-706(b). Rebarchek appealed to the referee who, after a full hearing, made detailed findings and concluded that Rebarchek was not guilty of misconduct within the meaning of K.S.A. 44-706(b)(1). The referee granted Rebarchek's claim.

Farmers appealed the referee's decision to the Board. The Board adopted the referee's findings and affirmed the referee's decision. Farmers appealed to the district court. The district court reversed the benefits decision of the Board, and in addition, held the Board erred in refusing to allow Farmers to have a copy of the transcript of the hearing before the referee for use in the appeal. The Board appealed.

*The benefits issue*

Review of a final Board order under the Employment Security Act is controlled by K.S.A. 1997 Supp. 44-709(i) of the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq*. Under K.S.A. 77-621(c), the district court can grant relief under certain limited circumstances. Among those circumstances are instances where the agency has erroneously interpreted or applied the law; where the agency has engaged in an unlawful procedure or has failed to follow prescribed procedures; or where the agency action

"is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act";

or when the agency's action is otherwise "unreasonable, arbitrary or capricious." K.S.A. 77-621(c)(4), (5), (7), (8).

We review the agency's decision in the same manner as the district court, reviewing the whole record and determining whether there is substantial evidence to support the agency's findings of fact. *Karns v. Kansas Bd. of Agriculture*, 22 Kan. App. 2d 739, 748, 923 P.2d 78 (1996). If an agency's action is constitutionally au-

thorized by statute, it is presumed valid on review unless it is not supported by substantial evidence and is so wide of its mark as to be arbitrary or capricious. *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 961, 811 P.2d 876 (1991). Persons claiming unemployment benefits are entitled to a liberal interpretation of the employment security statutes. *National Gypsum Co. v. Kansas Employment Security Bd. of Review*, 244 Kan. 678, 686-87, 772 P.2d 786 (1989).

The Board, through its adoption of the referee's findings, concluded that Rebarchek's actions did not constitute misconduct within the meaning of K.S.A. 44-706(b)(1). Misconduct disqualifying a claimant from unemployment benefits is defined as "a violation of a duty or obligation reasonably owed the employer as a condition of employment." In order to sustain a finding that such misconduct has occurred, the facts must show "[w]illful and intentional action which is substantially adverse to the employer's interests," or "carelessness or negligence of such degree or recurrence as to show wrongful intent or evil design." K.S.A. 44-706(b)(1). Moreover, an individual cannot be disqualified for misconduct if the individual was making a good faith effort to do the assigned work but was discharged due to inefficiency, unsatisfactory performance due to inability, incapacity or lack of training or experience, isolated instances of ordinary negligence or inadvertence, good faith errors in judgment or discretion, or for unsatisfactory work or conduct due to circumstances beyond the individual's control. K.S.A. 44-706(b)(4)(B).

The Board found that Rebarchek was discharged for not adequately carrying out his supervisory and managerial responsibilities after July 1994; that Rebarchek had delegated responsibility for reading the grain temperatures to Mudd and mistakenly believed that Mudd was making the readings and completing the assigned task as he had done in the past; and that Rebarchek's ability to perform the full range of responsibilities for his job had been hampered by his back injury. However, the Board noted that as soon as Rebarchek was cognizant of the problems which had evaded him due to his misplaced reliance on a previously adequate co-worker and Rebarchek's serious health problems, Rebarchek no-

tified his employer and took remedial action. While the Board acknowledged that even in his illness, Rebarchek was responsible for overseeing the work of his assistant, the Board did not believe that Rebarchek's conduct was intentional.

The district court in reversing the decision of the Board found that the Board acted unreasonably, arbitrarily, and capriciously in adopting the referee's findings and conclusion.

The district court opined that any reference to a job-related injury had been improper, and it concluded that the referee's decision was grounded in sympathy and based on the possibility Rebarchek's injury was work related. The court found (1) that the claimant had delayed 3 months in investigating the source of the poor quality grain after being informed of problems and that this delay in investigating the problem was a breach of his duties; (2) that Rebarchek had delegated both the functions and duties of his job as supervisor and that, as a matter of law, Rebarchek could not delegate such responsibilities; (3) that the delegation of his responsibilities had been a conscious and intentional choice by Rebarchek which adversely affected the employer and, thus, amounted to misconduct; and (4) that Rebarchek failed to make a good faith effort to satisfy his job responsibilities. The Board argues that the district court did not give the Board's findings proper deference and that the Board's findings were supported by substantial evidence.

Under the Act for Judicial Review and Civil Enforcement of Agency Actions, the district court is not to conduct a de novo review and may not substitute its judgment for that of an administrative agency; rather, it is the court's duty to review the whole agency record and to determine whether the agency's findings of fact were supported by substantial evidence. K.S.A. 77-621(c)(7); see *Karns v. Kansas Bd. of Agriculture*, 22 Kan. App. 2d at 748. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. 22 Kan. App. 2d at 748.

Arbitrary or capricious conduct may be shown where an administrative order is not supported by substantial evidence. *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343,

365, 770 P.2d 423 (1989). However, the actions of the administrative agency are considered rebuttably valid, and the burden of proving arbitrary and capricious conduct lies with the party challenging the agency's actions. 244 Kan. at 365.

The district court erred in deciding that the Board acted arbitrarily and capriciously in accepting the referee's findings and conclusion for the following reasons:

First, the district court erred in concluding that any reference to a job-related injury was inappropriate in this case. The referee's decision referred to Rebarchek's back problems as being work related. There was evidence that those back problems were, in part, work related, and that Rebarchek's workers compensation claim may have been part of the motivation for his termination. However, the Board's focus was not on the cause of the injury. Rather, the Board noted the injury to acknowledge that Rebarchek had a chronic and debilitating condition which absented him from work and which interfered with his ability to fully perform all the responsibilities of his job. The district court's conclusion that the referee's decision was motivated by the possibility that the injury was work related is not supported by the record.

Second, there was no evidence that Farmers' policy prohibited branch managers from delegating certain facility tasks to their assistants, and there was evidence that at least one other branch manager delegated facility responsibilities to his elevator employees. A manager necessarily delegates some tasks to those under his supervision, and the act of delegating to Mudd the responsibility for reading the hot spots was not, in itself, an act of misconduct, especially considering Rebarchek's illness and Mudd's experience and previous dependability. To the extent that the district court's decision might be construed as finding misconduct as a matter of law by the mere act of delegating this task to Mudd, the district court erred.

It is true that the losses in this case would have been avoided if Rebarchek had monitored Mudd more closely, frequently, and critically. However, under the statute in effect at the time, Farmers had to prove willful and intentional action adverse to its interests in order to show misconduct within the meaning of the statute.

See K.S.A. 44-706(b)(1). "Willful" conduct is generally understood as being action indicating a purpose, intent, or design to do wrong or to cause injury to another. See *Beck v. Kansas Adult Authority*, 241 Kan. 13, 33, 735 P.2d 222 (1987); *Weinzirl v. The Wells Group, Inc.*, 234 Kan. 1016, 1022-23, 677 P.2d 1004 (1984); *Anderson, Administrator v. White*, 210 Kan. 18, 19, 499 P.2d 1056 (1972).

There was no evidence that Rebarchek intended to do wrong or to cause injury to his employer's interests. Rebarchek's actions were, therefore, not willful, and amounted at the most to mere negligence without wrongful intent or evil design.

The district court was particularly critical of what it perceived as Rebarchek's long delay in investigating the problems with the grain. However, there was evidence that Rebarchek first detected problems with the *wheat* in September or early October and proceeded to turn the grain, take samples, and seek the source of the bad wheat. When the sample wheat results later came back at an acceptable grade 2 rating, and he was apparently unable to locate the source of the other bad wheat, Rebarchek believed the bad grain had been an anomaly and he perceived no reason to mistrust Mudd. When, in February he first detected the problems with Mudd's performance and the problems with the corn, Rebarchek immediately informed his supervisor and did what he could to remedy the situation. There was substantial evidence to support the Board's findings that Rebarchek's acts were not intentional or willful. The decision of the Board was not unreasonable, arbitrary, or capricious.

### The transcript issue

Farmers requested that it have a copy of the transcript of the benefits hearing before the referee so that it could prepare its argument for the appeal to the Board. The Board refused Farmers' request on the ground that it interpreted K.S.A. 1997 Supp. 44-714(f) as prohibiting a party from having a copy of the hearing transcript. Significantly, however, the Board allowed Farmers to have a copy of the transcript for its appeal to the district court. The district court agreed with Farmers' argument that the Board misinterpreted K.S.A. 1997 Supp. 44-714(f) and that Farmers should

have been provided a copy of the transcript. The Board argues on appeal that the district court's interpretation of the statute was incorrect.

Interpretation of a statute is a question of law over which an appellate court exercises unlimited review. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 514, 930 P.2d 1366 (1997). While the opinion of an administrative agency on questions of law carries great weight, the final construction of a statute rests with the courts. *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 246, 834 P.2d 368 (1992); *U.S.D. No. 500 v. Womack*, 20 Kan. App. 2d 608, 614, 890 P.2d 1233 (1995).

K.S.A. 1997 Supp. 44-714(f) is entitled "Records and reports." The first part of the subsection discusses records and information which must generally be kept by employers in accordance with the Act, the Secretary's right of access to such records, and the Secretary's power to audit employers' records periodically. Subsection (f) then continues:

"The secretary may require from any employing unit any sworn or unsworn reports, with respect to persons employed by it, which the secretary deems necessary for the effective administration of this act. Information thus obtained or obtained from any individual pursuant to the administration of this act shall be held confidential, except to the extent necessary for the proper presentation of a claim by an employer or employee under the employment security law, and shall not be published or be open to public inspection, other than to public employees in the performance of their public duties, in any manner revealing the individual's or employing unit's identity. *Any claimant or employing unit or their representatives at a hearing before an appeal tribunal or the secretary shall be supplied with information from such records to the extent necessary for the proper presentation of the claim.*" (Emphasis added.)

Farmers relies on the italicized language to support its argument that it should have been allowed access to the hearing transcript. We disagree. The "information from such record" refers to the records and reports previously mentioned in the subsection rather than to hearing transcripts which were not mentioned earlier in the subsection. Thus, the language of the statute relied upon by Farmers does not expressly require that hearing transcripts be made available to a party.

The Board relies on the following language of the subsection to support its argument that hearing transcripts are not to be made available to the parties on an appeal to the Board.

*"The transcript made at any such benefits hearing shall not be discoverable or admissible in evidence in any other proceeding, hearing or determination of any kind or nature. In the event of any appeal of a benefits matter, the transcript shall be sealed by the hearing officer and shall be available only to any reviewing authority who shall reseal the transcript after making a review of it. In no event shall such transcript be deemed a public record.* Nothing in this subsection (f) shall be construed to prohibit disclosure of any information obtained under the employment security law, including hearing transcripts, upon request of either of the parties, for the purpose of administering or adjudicating a claim for benefits under the provisions of any other state program, except that any party receiving such information shall be prohibited from further disclosure and shall be subject to the same duty of confidentiality otherwise imposed by this subsection (f) and shall be subject to the penalties imposed by this subsection (f) for violations of such duty of confidentiality." K.S.A. 1997 Supp. 44-714(f).

The first sentence of the italicized language does not provide the claimed prohibition. That sentence refers to the transcript being nondiscoverable and inadmissible as evidence at other proceedings. However, where a benefits determination by a referee is appealed to the Board, subsection (f) clearly provides for the reviewing authority, which would include the Board at the agency level, to review the transcript of the hearing. The transcript of the benefits hearing is necessarily part of the evidence in such appeal proceedings. Therefore, the language which makes hearing transcripts nondiscoverable and inadmissible as evidence "in any other proceeding, hearing or determination of any kind or nature" cannot be referring to the appeal proceedings before the Board and must logically be referring to proceedings, hearings, and determinations outside the unemployment benefits context.

The Board particularly relies on the second sentence of the italicized language, which reads: "In the event of any appeal of a benefits matter, the transcript shall be sealed by the hearing officer and shall be available only to any reviewing authority who shall reseal the transcript after making a review of it." K.S.A. 1997 Supp. 44-714(f).

Admittedly, the strict terms of this language taken out of context, could be interpreted to allow only reviewing authorities to see the transcript and to deny the parties in an unemployment case access to the transcript. However, in construing the statute, it is the court's task to determine the legislature's intent. *In re Application of Zivanovic*, 261 Kan. 191, Syl. ¶ 1, 929 P.2d 1377 (1996). In doing so, the court considers all the various provisions of a statute with the goal of reconciling different provisions to make them consistent, harmonious, and sensible. *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. at 353. In discerning legislative intent, the court is not, however, limited to a mere consideration of the language used, but may look to the historical background of the enactment, the circumstances attending its passage, the purpose accomplished, and the effect the statute may have under the various constructions suggested. *State v. Le*, 260 Kan. 845, Syl. ¶ 3, 926 P.2d 638 (1996).

K.S.A. 1997 Supp. 44-714(f) clearly seeks to preserve confidentiality, yet under the language provided in the first third of that subsection, the parties are given access to all employment records and reports to the extent necessary to present the claim. Confidentiality for such documents is preserved by limiting the use of the records and by declaring that such records are not part of the public record. However, it is not reasonable to permit the parties access to all the information in the case except the hearing transcript.

The parties to such hearings are already privy to what has been said and done at the hearing so that there is no reason they should be denied the opportunity to see the written record of that hearing. As long as the parties do not attempt to use or reveal the contents of the transcript for any unauthorized purpose—actions which would be prohibited by the statute if properly construed—the goal of confidentiality would not be thwarted by allowing the parties to have access to the transcript. Moreover, there is no point in prohibiting access to the transcript for the appeal before the Board while allowing access to the transcript for appeals to the district court and to the Court of Appeals as was permitted in this case.

The legislature is presumed to intend that a statute be given a reasonable construction in order to avoid absurd or unreasonable results, *Le*, 260 Kan. 845, Syl. ¶ 4, yet the Board's interpretation of the statute leads to just such an absurd result. Under the Board's interpretation, the parties may acquire access to a copy of the transcript to adjudicate claims for benefits under *other* state programs but not for preparing an appeal in the very context in which the transcript is most relevant—the unemployment benefits context. By preventing the parties from having access to all the information they might need to argue their case to the Board, the Board's interpretation of the statute frustrates the goal of ensuring the fair and efficient resolution of unemployment benefits claims.

The legislative history behind the statute also contradicts the Board's interpretation of the statute. The 1986 legislation through which the disputed language was added to the statute was contained in 1986 H.B. 2761. Initially, the proposed 1986 amendment to K.S.A. 44-714(f) only included the language about the transcript not being discoverable or admissible in evidence in other proceedings and about the transcript being sealed by the hearing officer, resealed by any reviewing authority, and not part of the public record. The amendment was intended to make hearing transcripts confidential just like the other records involved in unemployment benefits cases. See Special Report of the Kansas Chamber of Commerce and Industry, "Unemployment Comp. Proposals Readied," December 1985, Attachment No. 2 to Committee Minutes of the House Labor, Industry and Small Business Committee, February 6, 1986, p. 3.

The Advisory Council of the Department of Human Resources endorsed that early version of the bill in a written recommendation to the legislature. In doing so, the Council summarized the purpose of the amendment as follows:

"This proposal would provide that appeal hearing transcripts shall be confidential.
"Background:
"Most agency records are confidential by statute. Recently, there have been several attempts by attorneys to secure hearing transcripts for discovery purposes.

Each of these attempts required legal action by the Department in order to quash the subpoena.

"Enactment of this legislation would ensure that appeal hearings are held in conformity with federal procedure and the testimony of witnesses would not be available *in unrelated cases*." (Emphasis added.) Legislative Recommendations of the Advisory Council of the Department of Human Resources, Attachment No. 3 to Minutes of the House Labor, Industry and Small Business Committee, February 6, 1986, p. 5.

The legislation was clearly viewed as prohibiting access to the hearing transcripts for use in "unrelated cases"—meaning, outside the unemployment benefits context.

As explained by Representative Mike O'Neal in a memorandum to the committee, the Advisory Council sought the amendment to ensure that Kansas employment security law was in compliance with the federal Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.* (1994) and the federal regulations promulgated under that Act. See February 12, 1986, Memorandum from Representative Mike O'Neal to the House Labor and Industry Committee regarding Proposed Confidentiality Language in H.B. 2761, Attachment No. 1 to Committee Minutes of meeting held February 13, 1986.

O'Neal proposed an amendment to the bill which would add language to clarify that the nondisclosure rules of subsection (f) were not to be construed to prohibit disclosure of records and hearing transcripts to the parties who had been involved in the unemployment benefits case for purposes of adjudicating a claim for benefits under other state programs. See Minutes of the Committee on Labor, Industry and Small Business, February 19, 1986. O'Neal's proposed amendment remains in the statute today.

The legislative history described indicates that the language of K.S.A. 1997 Supp. 44-714(f) limiting access to benefits hearing transcripts was not intended to prevent the parties involved in the unemployment benefits case from having access to the transcript for purposes of appealing to the Board. The amendments were intended to make hearing transcripts confidential like other records in unemployment benefits cases in order to comply with federal law and to facilitate the fair and efficient administration of the act.

In light of the legislative background, the other language of the subsection, and the lack of any plausible justification for a legisla-

tive prohibition like that urged by the Board, the Board's interpretation of the statute is rejected. In particular, the specific language of the statute which requires the hearing officer and the reviewing authority to keep the record sealed should not be construed as prohibiting the parties access to the transcript for purposes of appealing to the Board, but should, instead, be construed as emphasizing that the transcript contains confidential information and is not part of the public record.

Although the Board erred in refusing to allow Farmers access to the transcript of the benefits hearing for its use in its appeal to the Board, we need not remand for hearing before the Board. The record is convincing that Rebarchek's actions were not willful and did not constitute misconduct that would disqualify him from benefits. We affirm the district court's decision concerning the transcript issue but reverse its decision denying benefits to Rebarchek.

Affirmed in part and reversed in part.